Collins, S.
The trustee under the will of Richard Charles Perkins has rendered a final account of its proceedings. The text of the testator’s will in and of itself poses no problem in respect of the distribution of the remainder. However, the trustee is in doubt as to the effect of the English National Health Service Act, 1946 (9 & 10 Geo. 6, ch. 81) upon two remainder gifts of $100,000 each, and it asks the court to issue directions as to the proper disposition of this portion of the remainder.
The testator was born in England on August 4, 1840. He came to this country in 1865, and became a citizen of the United States in 1897. He remained domiciled here. It was his custom to make business trips to England almost every year, and in the course of those trips, to visit his two brothers and his niece, who resided at Bradford. The testator’s very substantial estate was accumulated through his own business efforts.
At the time of his death on February 27, 1907, the testator was a resident of New York. He was survived by his widow and one daughter. His will set up his entire residuary estate in trust for the joint lives of his wife and daughter. Provision was made for payments from income to his two brothers and to his niece, and had they survived the termination of the trust they would have shared in the remainder. The widow’s death occurred on October 7, 1941, and the daughter died on March 27, 1952, leaving no issue. The two brothers and the niece predeceased the daughter. The text of the will which disposes of the remainder in these circumstances reads as follows: “ If there shall be no lawful issue of my said daughter then living, and no survivor of my said brothers and niece, the entire principal of said trust fund shall then be equally divided and paid over as follows: To the New York Hospital in the City of New York, The General Infirmary at Leeds in Yorkshire, England, and the Bradford Royal Infirmary and Dispensary at Bradford, *593 Yorkshire, England, the sum of One hundred thousand ($100,-000) dollars each, to be applied by each of said institutions to its general uses; and the remainder of said trust fund shall be divided and paid over in equal shares to my friends, * * * or to the survivors or survivor of them ’ ’. Of the three friends named in the will, only one, Samuel Pearsall, survived the termination of the trust. He is a party to this proceeding.
The facts, as stipulated in writing by counsel, are briefly the following: The provisions of the National Health Service Act became operative in England on July 5, 1948. The General Infirmary at Leeds, in Yorkshire, England, was established in 1767 as a nonincorporated institution and its principal officers and governors were incorporated by Boyal Charter on August 20, 1937, under the name of The General Infirmary at Leeds. The purposes of this institution as stated in its charter are: “ The treatment of the sick and injured poor; The accommodation and treatment of patients who are able and willing to make payments therefor in pursuance of any Order made in that behalf under the provisions of the Voluntary Hospitals (Paying Patients) Act, 1936; The training of Nurses and Medical Students; The maintenance of an educational centre for the development of research work and the prevention of disease ’ \ Upon the incorporation of the chartered body in 1937, the association of natural persons constituting the unincorporated body ceased to function and has ever since been defunct, but the charitable activity continued uninterrupted under the control of the corporate body and so continued up to July 5, 1948. Under English law the change from a nonincorporated institution to a corporation would have no effect upon its legal existence and identity, and the charity would be treated as having a continuing existence and identity throughout the whole period up to July 5, 1948.
The legal estate in the land, buildings and equipment of The General Infirmary at Leeds vested in the Minister of Health on July 5,1948. Under the terms of subsection (4) of section 6 of the act all “ property transferred to the Minister under this section shall vest in him free of any trust existing immediately before the appointed day, and the Minister may use any such property for the purpose of any of his functions under this Act, but shall so far as practicable secure that the objects for which any such property was used immediately before the appointed day are not prejudiced by the provisions of this section.”
Prior to July 5, 1948, The General Infirmary at Leeds was administered by certain officers and governors and the manage *594 ment was in the hands of a body called the board of management. Although the corporation itself was not dissolved by the National Health Service Act, the governing body was dissolved by section 78. The Minister of Health has designated The General Infirmary at Leeds as a teaching hospital as provided in section 11 of the act. The Board of Governors of the United Leeds Hospital was constituted by the Minister of Health to manage and control The General Infirmary, in accordance with section 12 of the act. After July 5, 1948, four hospitals were under the management and control of the Board of Governors of the United Leeds Hospital. These hospitals are known as: The General Infirmary at Leeds; The Hospital for Women at Leeds; The Maternity Hospital at Leeds; and the University of Leeds Dental Hospital. On and after July 5, 1948, the corporate body known as The General Infirmary at Leeds had no title to any property real or personal, had no liabilities, and no functions to perform.
The Bradford Boyal Infirmary located at Bradford, Yorkshire, England, is the hospital referred to in the will as “ the Bradford Boyal Infirmary and Dispensary at Bradford, Yorkshire, England ’ ’. It was a nonincorporated institution at all times up to the effective date of the National Health Service Act. The purposes of the institution are stated in part in the rules and orders of the Bradford Boyal Infirmary as follows: “ No patient can be admitted unless furnished with a regular recommendation, except in eases of emergency. The only proper objects of the Charity being the Sick Poor, no persons shall be admitted who are able to maintain themselves and pay for medical aid.”
The governing head of the institution was heretofore known as the board of management of the Bradford Boyal Infirmary. The functions of that board did not survive the operative date of the act and the board of management, by virtue of the act, was terminated.
Pursuant to orders of the Minister of Health, The Leeds Begional Hospital Board was instituted to administer the area in which the Boyal Infirmary was located, and by plans submitted by the regional board and approved by the Minister of Health, the region was subdivided into a number of groups. One of these groups, known as the Bradford “ A ” Group Hospital Management Committee was appointed to control and manage a group of eleven hospitals and two clinics, including the Bradford Boyal Infirmary. On the operative date of the act, all of the property of the Bradford Boyal Infirmary became vested in the Minister of Health. ‘ ‘ Funds donated in the form *595 of legacies and gifts from private individuals have been received by The Hospital Management Committee, Bradford ‘ A ’ Group, and have been used to provide extra amenities for patients and nursing staff such as radio for each bed, television sets for wards and the nurses’ home, special research apparatus, for example in the x-ray department of the Bradford Boyal Infirmary. ’ ’
Section 59 of the National Health Service Act provides that the Board of Governors of any teaching hospital and a Hospital Management Committee shall ‘ ‘ have power to accept, hold and administer any property upon trust for purposes relating to hospital services or to the functions of the Board or Committee under Part II of this Act with respect to research.”
After July 5, 1948, there continued to be a hospital on the same premises as The General Infirmary at Leeds and it continues to be known by the same name. After July 5, 1948, there continued to be a hospital on the same premises as the Bradford Boyal Infirmary and it continues to be known by the same name. The names by which these institutions were formerly known are still used in publications, reports and documents, such as hospital directories, the hospital’s yearbook, the medical directory, the local government manual and directory, local telephone directory, and in local and national newspapers.
Prior to July 5, 1948, the patients at The General Infirmary at Leeds, excluding one wing, were treated free of charge, but were expected to contribute toward the cost of maintenance if they could afford to do so. No fixed charges were made for medical treatment except X rays. In practice all patients, even those in the main block who could afford to do so, were expected to contribute toward the cost of their accommodation and treatment in the hospital although the doctors gave their services free. Prior to the National Health Service Act, some of the patients in the Bradford Boyal Infirmary were treated free of charge and some of the patients were “ treated for pay.” The charges made were adjusted to the patient’s means if the persons paid anything at all, hut poor persons were not expected to make any payment at all.
After the enactment of the National Health Service Act, health services in Great Britain became available to everyone regardless of his ability to pay. The act authorizes the Minister of Health to make certain accommodations available for patients who undertake to pay for the accommodation at charges prescribed therefor, and to allow medical practitioners to make arrangements for the treatment of private patients in special accommodations (§§ 4, 5), and accordingly “amenities and a *596 small number of private rooms are available for additional charges for others desiring same. Generally speaking, the patients treated at the two aforesaid English hospitals since nationalization are in comparable income brackets with those treated prior to nationalization.” Nonetheless, health services are available to all on the same conditions, and ability to pay is not a condition to enjoyment of general hospital services.
The Board of Governors of the United Leeds Hospital and the Bradford “A” Group Hospital Management Committee are bodies corporate with perpetual succession by virtue of the National Health Service Act.
In addition to the above facts which are agreed upon by counsel, a number of exhibits have been submitted on consent that they be admitted in evidence as Exhibits (a) to (nn) inclusive.
The two $100,000 legacies are claimed on behalf of the two English hospitals by the respective corporate bodies which now administer the hospitals. The Minister of Health for Her Majesty’s Government has also appeared and supports the claims of the hospitals. They contend that the sum of $100,000 should be paid to the Board of Governors of the United Leeds Hospitals to be applied to the general uses of The General Infirmary at Leeds and that a like sum should be paid to the Bradford “A” Group Hospital Management Committee to be applied to the general uses of The Bradford Royal Infirmary. The executor under the will of the daughter (who was the sole legatee under the widow’s will) contends that the two hospitals named in the will were extinct when the legacy became payable, that the legacies lapsed and the funds therefore pass as intestate property to the statutory distributees of the decedent. The sole survivor of the three individual remaindermen maintains that the legacies lapsed, but that the moneys fall into the residue and are payable to brm as the sole survivor of those entitled to the residue. The society of the New York Hospital takes the position that the testator had a general charitable purpose, namely, the care of the sick or injured poor; that the two named institutions do not exist in substance or in fact as the living entities known to and intended by the testator; that the management bodies of the original institutions having been formally dissolved, the funds must in any event be awarded to different entities to execute the charitable purpose; and that the general charitable purpose of the testator can best be executed cy pres by payment of the sums to the New York Hospital.
Insofar as the identity of each of the two hospitals is concerned, it is conceded that there continues to be a hospital on *597 the same premises as heretofore and it continues to be known by the same name as it was heretofore known. The familiar name of each hospital is not only in ordinary and popular use but continues to be used in publications, reports and directories. The fact that one governing body has gone out of existence and a new governing body has been created has no effect upon the identity and continued existence of the institution. The group of persons who conduct the affairs of business or charitable organizations must of necessity change with the passage of time. The legal organization of a charity may be altered very substantially without in any way changing the institution’s essential character. Amid all the changes of administrators and administration, the same hospital continues under the same name and at the same location to render the same care and treatment of the sick and injured.
It is asserted, however, that identity with the institution named in the will has been lost for another reason, that is, -the class of people now treated at the hospitals is different from the class which this testator intended to benefit, and that his charitable intent will be frustrated by payment to the presently existing institutions. The contention is based upon the premise that in directing that the legacies are “to be applied by each of said institutions to its general purposes ”, the testator intended to make a gift to institutions which had the same general charitable purposes as those stated in the rules or charter of the institution at the time of his death. "When the testator died, these two institutions were organized primarily for the treatment of the sick and injured poor, and, it is argued, institutions of such character were intended by the testator as the only objects of his bounty. Since both hospitals must now treat all persons without regard to their wealth or poverty, they have become, it is said, institutions of a different character than those designated by the testator.
It is, of course, possible that an institution should so change its character and its services as to lose its identity with its former self. It is possible, too, for a testator to annex to a legacy such conditions and limitations that slight changes in the corporate charter would cause it to forfeit the gift. He could have said in his will that the remainder gift would in each case be payable only if each hospital then treated only persons unable to pay and no other persons. This testator has not, however, annexed any such condition or restriction to his gift. To say that he intended the legacy to go to a hospital only so long as it confined its services and accommodations to poor persons would import into the will limitations which the testator *598 did not incorporate either expressly or by fair implication. If he had any intent to so condition the legacy, he failed to manifest it, and no court would be justified in reading such terms and conditions into the legacy. Indeed, such a limitation would be based purely on a guess as to his probable feelings in the matter.
It is true that the charter of one hospital and the fundamental rules of the other had stated that treatment of the sick poor was the primary object of the institution. However, the treatment of all sick and injured who were in need of treatment, was recognized as a legitimate charitable activity and in point of fact it appeared that both hospitals expected payment for treatment and accommodations to the extent of the patient’s ability to pay. Counsel have stipulated that both hospitals treated others than the destitute sick and they expected to be paid in accordance with the financial ability of the patients. Moreover, it is stipulated that, ‘ Generally speaking, the patients treated at the two aforesaid English hospitals since nationalization are in comparable income brackets with those treated prior to nationalization.” It seems clear, therefore, that neither of the two English hospitals has changed its essential services in such a way as to cause it to lose identity with the institution designated by the testator.
We come then to the effect of nationalization itself upon the hospitals. Prior to the National Health Service Act, the hospitals were dependent upon voluntary contributions and the receipt of sums paid by patients for services and treatment. Contributions and legacies would enable a voluntary hospital to provide essential services and to expand its services, accommodations and research. When the hospitals became subject to the National Health Service Act, their basic needs were met by contributions from the State. That is not to say, of course, that their every need is completely satisfied, but it must surely mean that basic and essential costs must be so met. Undoubtedly this kind of change might cause a prospective donor to modify the terms or conditions of his donation or even to select a new beneficiary. Some testators did in fact guard against distribution to nationalized institutions. (See 96 Sol. J. 827, 828.) This testator, who died in 1907, could not have foreseen such a development and we can hardly speculate as to how he might have viewed the idea of nationalization in and of itself.
If all of the funds payable to any hospital were to be paid into the national treasury for general governmental purposes, or if any sum received by any hospital would result in a pro tanto reduction of the sum appropriated for that hospital by the Government, it might truly be said that the testator’s funds *599 would be devoted to a purpose entirely different from that intended by him. In such case it would be impossible to devote the testator’s funds to the particular charitable use designated by him. Section 59 of the National Health Service Act, however, provides that a ‘ ‘ Regional Hospital Board and the Board of Governors of any teaching hospital and a Hospital Management Committee shall have power to accept, hold and administer any property upon trust for purposes relating to hospital services or to the functions of the Board or Committee under Part II of this Act with respect to research.” (Emphasis added.) The Minister of Health and the corporate bodies administering the two hospitals ask the court to direct payment of the funds to the respective corporate bodies “to be applied to the general uses ” of the particular hospitals. They assure the court that they may and will so apply the funds and they offer to post security for their faithful execution of the terms of the gift. It appears therefore, that the funds can be devoted to the particular hospital and to its uses alone.
In the argument it is suggested that the management groups will be able to devote the funds only to purposes that have little connection with hospital work. In the stipulation of facts it is stated that funds donated in the form of legacies “ have been received ” by the Hospital Management Committee, Bradford “ A ” Group, and ‘ ‘ have been used to provide extra amenities for patients and nursing staff.” Some of the articles that come under the head of “ amenities ” are specified, “ such as radio for each bed, television sets for wards and the nurses’ home, special research apparatus, for example in the x-ray department of the Bradford Royal Infirmary.” It does not appear, however, that these examples are intended to be a complete statement of the purposes for which legacies may be used and it clearly appears that this is not a complete catalogue.
Some of the parties have taken from the records, expenditures which are listed under the head of “ amenities ”, such as a hard top tennis court for the staff, and emphasizing that disbursement, give the term “amenities” a meaning that relates it to luxuries and other items not connected with the treatment and care of the sick. That is not a fair definition of the term as used herein. We could take a different particular example from the record as indicative of a broader meaning for the term. For example, in the 1949 report of the Bradford “A” Group Hospital Management Committee the chairman reported on works of the hospitals which had already been carried out or which were nearing completion. The list of repairs or improvements concludes with the following: replace *600 ment of a large amount of worn-out or unsuitable furniture at several hospitals; arrears of painting and building repairs in the hospitals of the group. The report continues: “ The last two items represented in themselves a very considerable expenditure in money but contributed in no small measure to the amenities of life in hospital for both patients and nurses.” (Emphasis added.) In the same report there is this statement: “ Many times during the last six months enquiries have been made as to the position regarding gifts to hospitals, and it is clear that many people would still wish to give of their means to help those who are sick. Indeed, since this Committee has been at work, we have received numerous gifts, both in cash and kind, and I would like to express our grateful thanks to the donors. Whilst it is not the Minister’s wish that we should appeal for donations, it is only right that I should make it known that we are allowed to receive from charitably disposed persons funds which may be disbursed by the Committee, either at their own discretion or in pursuance of the donor’s wishes, for the special purpose of providing additional amenities or carrying out some particular piece of work.”
It is apparent, and it is of course to be expected, that the funds provided by the government for the various hospitals could not be large enough to enable them to do all that the administrators would wish in the care and treatment of the sick and in providing comforts for them and necessary facilities for the staff. The court is satisfied that funds received by the respective corporate bodies can be devoted to the general purposes of the respective hospitals, as this testator directed. What comes within the scope of the “ general uses ” of the hospital must in good faith and in the exercise of good judgment be determined by the corporate body administering the affairs of that hospital. Each of the hospitals is willing to post a bond as security for its faithful performance of the conditions annexed to the gift.
The court therefore holds that the sum of $100,000 is to be paid to the Board of Governors of the United Leeds Hospitals, to be applied to the general uses of The General Infirmary at Leeds, in Yorkshire, England and that the further sum of $100,000 is to be paid to the Hospital Management Committee, Bradford “ A ” Group to be applied to the general uses of the Bradford Boyal Infirmary, Yorkshire, Ehgland.
The result reached by the court is in accordance with the decision of this court in Matter of Bishop (206 Misc. 7) and of the English courts in Matter of Morgan’s Will Trusts ([1950] Ch. 637); Matter of Frere ([1951] Ch. 27); Matter of Ginger *601 ([1951] Ch. 458); Matter of Meyers ([1951] Ch. 534); Matter of Glass ([1950] Ch. 643), and Matter of Hunter ([1951] Ch. 190).
There being no objections to the account, a decree may be submitted, on notice, settling the account and directing distribution accordingly.