### (June 5, 1956)

■ In the Matter of the Accounting of UNITED STATES TRUST COMPANY OF NEW YORK, as Trustee under the Will of RICHARD C. PERKINS, Deceased, Respondent. CHASE MANHATTAN BANK, as Executor of FLORENCE PERKINS, Deceased, et al., Appellants; HOSPITAL MANAGEMENT COMMITTEE, BRADFORD "A" GROUP, et al., Respondents. (Consolidated Appeals.)

FRANK, J. (dissenting). The majority is affirming the determination of the learned Surrogate in this proceeding upon the authority of *Matter of Bishop* (1 A D 2d 612). In doing so, the majority holds, in effect, that the establishment of the National Health Service in the United Kingdom has not altered the status and functions of voluntary private hospitals so as to disqualify them for benefits under a New York will. I must dissent upon that issue.

In his will the testator created a trust. The contingencies provided therein occurred and the remainder vested, if there was no lapse, on March 27, 1952.

The cogent testamentary provision reads as follows: "To the New York Hospital in the City of New York, the General Infirmary at Leeds in Yorkshire, England, and the Bradford Royal Infirmary and Dispensary at Bradford, Yorkshire, England, the sum of One hundred thousand ($100,000.) dollars each, to be applied by each of said institutions to its general uses".

The General Infirmary at Leeds, in Yorkshire, England, was established in 1767 as a nonincorporated institution, and its principal officers and governors were incorporated by Royal Charter on August 20, 1937. Among the purposes of the institution as stated in its charter was: "The treatment of the sick and injured poor".

The Bradford Royal Infirmary had for its purposes "The only proper object of the Charity being the Sick Poor, no persons shall be admitted who are able to maintain themselves and pay for medical aid."

Prior to nationalization, both institutions treated patients free of charge except that those who could afford to contribute toward the cost of their accommodation and treatment in the hospital were required to do so.

The learned Surrogate correctly found that: "On and after July 5, 1948 the corporate body known as The General Infirmary at Leeds had no title to any property real or personal, had no liabilities, and no functions to perform." With respect to the Bradford Royal Infirmary he stated that: "The functions of that board did not survive the operative date of the Act and the Board of Management, by virtue of the Act, was terminated."

The legal estate in the land, buildings and equipment of both institutions vested in the Minister of Health on July 5, 1948, the operative date of the National Health Service Act. Under the terms of subdivision (4) of section 6 thereof, all "property transferred to the Minister under this section shall vest in him *free of any trust* existing immediately before the appointed date, and the Minister may use any such property for the purpose of any of his functions under this act". (Emphasis supplied.)

Pursuant to the act, a regional board was created which assumed control of Leeds Hospital. In addition, the board acquired a hospital for women, a maternity hospital and the University of Leeds Dental Hospital. The Bradford Hospital was turned over to a governmental group known as "Bradford 'A' Group Hospital Management Committee" which controls and manages a group of 11 hospitals and 2 clinics. All the property of these institutions vested in the Minister of Health.

On July 5, 1948, all health services in Great Britain became available to everyone as a matter of right, regardless of ability to pay. These services included medical treatment at home or at offices of designated physicians, dental and opthalmolic services, the attendance of midwives, and hospitalization for all who required it. It is true that with respect to hospitalization some special accommodations are set aside for patients who undertake to pay at prescribed rates. These are available, however, only after all others who are entitled to treatment without pay are provided for.

The Surrogate found, "It is true that the charter of one hospital and the fundamental rules of the other had stated that treatment of the sick poor was the primary object of the institution" and, "It is, of course, possible that an institution should so change its character and its services as to lose its identity with its former self. It is possible, too, for a testator to annex to a legacy such conditions and limitations that slight changes in the corporate charter would cause it to forfeit the gift. * * * This testator has not, however, annexed any such condition or restriction to his gift. To say that he intended the legacy to go to a hospital only so long as it confined its services and accommodations to poor persons would import into the will limitations which the testator did not incorporate either expressly or by fair implication. If he had any intent to so condition the legacy, he failed to manifest it".

I cannot agree with the foregoing statement. It might well be true if the will were executed and the testator died after the enactment of the statute nationalizing hospitals. This will, however, was drawn some time before February 27, 1907, and became effective upon the death of the testator on that date. At that time there could not have been granted to anyone even a glimmer of prescience that the hospitals in England were to become the property of the United Kingdom, and that it would assume the obligation of furnishing to all of its subjects the health services of the wide variety and nature encompassed under the National Health Service Act.

It is a fair inference that when the will was executed, and at the time that he died in the city of New York in 1907, as a resident thereof, the testator was fully aware of the operation of the Leeds and Bradford Hospitals as charitable institutions. The inference assumes even greater validity when it is observed that in the very same paragraph of the will, provision was made for a gift to a voluntary private hospital in this city which furnished care and treatment to charity patients, although municipally maintained hospitals, such as Bellevue, provided a similar service. It is evident that the testator manifested a general charitable purpose. Where, as here, there is no factual dispute, interpretation becomes a matter of law (*Underhill* v. *Vandervoort*, **56 N. Y.** 242, 247; *Matter of Potter*, 307 N. Y. 504, 515).

There can be no serious dispute that by taking title to all the property of medical institutions such as hospitals, clinics, schools and sanatoria and by the assumption, as a sovereign obligation, of the duty to supply medical and hospital care, the British Government converted what had previously been eleemosynary enterprises into a governmental function maintained by parliamentary appropriations and paid for by taxes collected from all subjects.

The intent of the British Government becomes evident from an examination of the parliamentary debates which preceded the enactment of the statute. Mr. Aneuran Bevan, the Minister of Health, stated (422 House of Commons Debates [5th Series], p. 47): "I believe it is repugnant to a civilised community for hospitals to have to rely upon private charity". "If we are to carry out our obligation * * * then the nation itself will have to carry the expenditure, and cannot put it upon the shoulders of any other authority" (p. 50).

When objection was made that the bill menaced all charitable foundations by diverting trust funds of the voluntary hospitals to purposes other than those intended by the donors (p. 61), Mr. Bevan replied (p. 62): "Do hon. Members opposite suggest that the intelligent planning of the modern world must be prevented by the endowments of the dead? Are we to consider the dead more than the living? Are the patients of our hospitals to be sacrificed to a consideration of that sort?"

A plan for retaining voluntary hospitals by supplying them with public funds to augment their incomes was abandoned in favor of nationalization or, as referred to in debate, "State ownership of the hospitals." The discussions (428 House of Commons Debates [5th Series], pp. 1070-1098) indicate that the parliamentary intent was that gifts to the general fund were to go to the Minister of Health or to the governing boards and were to be free from any trust feature or from any endowment fund.

The Lord Chancellor, Jowitt, stated in the House of Lords (143 House of Lords Debates [5th Series], p. 2): "I must remind your Lordships that this is a Bill to introduce an altered, and extended, and in some respects, a new service. It is not a Bill to preserve ancient monuments." "I do not believe we can any longer rely on charity to defray the main hospital expenses * * * The people who are now going to be compelled to pay * * * should not be called upon any longer to provide by charity for the essential expenses" (p. 6).

It must be emphasized that the charitable elements involved in the maintenance of these hospitals have been completely erased and therefore the intent of the decedent to make gifts to the named institutions, based upon their charitable and voluntary character at the time of his death, cannot be fulfilled.

Our attention has been directed to a number of English and Scottish cases (*Re Frere*, [1950] 2 All E.R. 513; *Re Morgan's Will Trusts* [1951] Ch. 637; *M'Clement's Trustees* v. *Campbell*, [1951] S. C. 167; *Re Kellner's Will Trusts* [1949] 2 All. E.R. 744), in which the Chancery Courts in those countries have held that bequests made to nationalized hospitals do not lapse. These courts are bound by the declaration of their national policy and manifestly within that frame the decisions may well be proper. We, however, are not bound by British national policy. Ours is entirely to the contrary, for we do not as yet recognize the nationalization of health services either in law or in principle. Moreover, under the British parliamentary system, the courts are not co-ordinate branches of government and do not pass upon the constitutionality of legislation, as do our judicial forums. It may well be that under English law there is no prohibition against legislation impairing contractual obligations, such as we have, and that the abolition of existing charitable trusts may be perfectly proper.

It is a fair inference that the respondents, Bradford "A" Group Board of Governors and the Ministry of Health for Her Majesty's Government, realize that the basic charitable purposes of the hospitals in question no longer exist when they suggest that if the gifts are directed to be paid they will be used for supplying "amenities" not provided by the National Health Service. Such funds have been used to furnish radios and television sets for wards and nurses' quarters, for special research apparatus, for Christmas festivities for the staff, for traveling fellowships, and for the construction of tennis courts. I cannot conceive that this testator ever intended that his gifts should be used for any such purposes. At the time of the execution of the will and when the testator died, both institutions furnished basic hospital services for the indigent sick, and there is no proof that they provided amenities for the comfort of doctors and nurses on the staff, desirable as they may have been.

The British Government has indicated that if these gifts are delivered they will be devoted to such ends and will not be mingled with the general funds provided for the maintenance of the hospitals. While I do not question the integrity of the commitment, the fact is that the act provides that any funds received by way of gift to the general funds can be used by the minister without a binding trust. Moreover, the very offer made by the Minister of Health would seem to be a tacit admission that the purpose for which the gifts were made no longer exists. It is settled law that a donee may not receive a gift for one purpose and use it for another (*St. Joseph's Hosp.* v. *Bennett,* 281 N. Y. 115, 123; *Sherman* v. *Richmond Hose Co.,* 230 N. Y. 462).

The manifestation by the testator of a general charitable intention and the conclusion which I reach that the named English hospitals no longer exist, either in fact or as voluntary or charitable institutions, require the application of the cy pres doctrine (*City Bank Farmers Trust Co.* v. *Arnold,* 283 N. Y. 184). Since the testator's charitable intention included a New York hospital, it would seem that the gifts should be assigned to a voluntary or voluntary hospitals in the city of New York (*Matter of Gary,* 248 App. Div. 373, affd. 272 N. Y. 635 and cases cited).

The decree should be reversed and the matter remitted to the Surrogate's Court for determination in accordance with this opinion.

Botein, J. P., Rabin, Valente and Bergan, JJ., concur in decision; Frank, J., dissents and votes to reverse, in opinion.

Decree, so far as appealed from, affirmed with costs to all parties appearing and filing briefs herein, payable out of the estate. [1 Misc 2d 589.] [See *post,* p. 664.]