In the Matter of the Accounting of S. SHELDON JUDSON et al., as Surviving Trustees under the Will of ELIZA L. ABLETT, Deceased, Respondents. CENTRAL ASSOCIATION FOR THE BLIND, INC., et al., Appellants; BOARD OF GOVERNORS OF THE LONDON HOSPITAL, Respondent.

Fourth Department, July 11, 1956.

*Francisco Penberthy* and *Milton D. Nelson* for Central Association for the Blind, Inc., appellant.

*Moses G. Hubbard* for Young Women's Christian Association, Inc., and another, appellants.

*Arthur N. Gleason* for Camp Healthmore, Inc., appellant.

*Bartle Gorman* and *Francis P. Finnegan* for Thomas A. Lissaman and others, appellants.

*James Maxwell Fassett* and *Arnold E. Rubinstein* for the Board of Governors of London Hospital, respondent.

*Judson & Cardamone* for trustees, respondents.

*Jacob K. Javits, Attorney-General (Sidney Kelly, Jr.,* and *James O. Moore, Jr.,* of counsel), for unknown beneficiaries.

WILLIAMS, J. This is an accounting proceeding by the trustees under the will of Eliza Lillian Ablett. The will was executed in 1931, and testatrix died in the same year. Petitioners seek construction, in the light of events which have transpired, of paragraph 17 of the will, which, so far as relevant, provides: '' Upon the death of James Vincent [testatrix' step-brother and the life beneficiary of the residuary estate], and after the deduction of the above bequest [to a humane society], I direct my trustees to divide my residuary estate into five equal parts and to pay one of said parts to the London Hospital of Whitechapel, London, England, to be known as the Robert Ablett Memorial, the income of which is to be used for such purposes as the board of managers or directors may deem advisable; [there follow identical gifts of one fifth of the residuary estate to four named Utica, N. Y., charities: the Y. W. C. A., Inc., the Door of Hope, Inc., Camp Healthmore, Inc., and the Central Association for the Blind, Inc.] * * *. In case any of the specific legacies mentioned herein shall lapse or become void, I direct that such become a part of my residuary estate.'' The life tenant, James Vincent, died in 1951.

In 1946, by Act effective July 5, 1948 the British Government nationalized certain hospitals including the London Hospital, by passage of the British National Health Service Act, 1946 (9 & 10 Geo. VI, ch. 81; hereinafter called '' Act ''). We must decide the effect of this Act upon the share of the London Hospital, which is claimed by the board of governors thereof, by the other four charities jointly, and also by the next of kin, who are nephews and nieces of a first cousin of the testatrix. The Special Surrogate has decreed that the board of governors of London Hospital is entitled to the legacy, which shall be invested '' as a separate endowment fund to be known as The Robert Ablett Memorial and the income from such fund shall be applied for research, services, and facilities, or other purposes benefiting the patients of London Hospital, as the Board of Governors may deem advisable ''. The board of governors has filed an undertaking to comply with this decree, from which the next of kin and the other four charities appeal. The latter group of charities also appeals from the decree so far as it directs that allowances to the attorneys be paid from the residuary estate generally, rather than from the share of the London Hospital.

The London Hospital of Whitechapel was incorporated in 1758 by royal charter. It became the largest "voluntary" hospital in England, nonprofit and nonsectarian. The testatrix herself was a patient at the London Hospital in 1891. It is unnecessary to consider the problems confronting private hospitals prior to 1946, except to say that because of financial necessity and for other reasons which satisfied the British Parliament, voluntary hospitals were nationalized by said Act. Prior to the effective or appointed day, the Minister of Health designated the London Hospital as a teaching hospital, which means that it is affiliated with a medical college. He also, by order, constituted a "Board of Governors" appointed by him to administer the hospital (§ 11, subd. [8]; 3d Schedule, part III). The board of governors is a body corporate with perpetual succession (3d Schedule, part IV). Prior to the Act the hospital was managed by the governors of London Hospital. Certain of the former governors became members of the new board of governors, but on the appointed day the governors' ownership and control of the hospital was divested without compensation. The old governing bodies were not automatically dissolved by the Act (Matter of Kellner, [1950] Ch. 46), but only if their "functions wholly cease in consequence" thereof (§ 78). The former governors have continued to perform functions not affected by the Act — chiefly as trustees of certain trusts — and have therefore not been dissolved.

By section 6 of the Act the physical properties of the London Hospital were transferred to and vested in the Minister of Health. By subdivision (1) of section 7 "all endowments of the hospital held immediately before the appointed day shall on that day, by virtue of this Act, be transferred to and vest in the Board of Governors". Section 60, so far as relevant, provides: "(1) Where property, other than property transferred to the Minister or to the Board of Governors of a teaching hospital * * * under section six or section seven of this Act, is held on trust immediately before the appointed day, and the terms of the trust instrument authorise or require the trustees, whether immediately or in the future, to apply any part of the capital or income of the trust property for the purposes of any hospital to which section six of this Act applies, the trust instrument shall be construed as authorising or, as the case may be, requiring the trustees to apply the trust property * * * to the Board of Governors * * * (2) Any sums paid as aforesaid to any such Board * * * shall, so far as practicable, be applied by them for the purposes

specified in the trust instrument.'' The British courts, resolving a problem of statutory construction which it is unnecessary for us to consider, have held that section 60 applied to such a case as this (*Matter of Kellner, supra*; *Matter of White*, [1951] 1 All E. R. 528). By virtue of section 60, the legacy to the London Hospital, vesting, as we shall show, in the old governors at the time of the death of the testatrix, was transferred to and vested in the new board of governors, to be applied by them '' so far as practicable '' to the purposes specified in the will.

By the Act, Parliament has undertaken to provide public funds to cover the general expenses of the minister and the board in operating and maintaining the hospitals nationalized. The board is not allowed to have a deficit. When the testatrix died in 1931, the hospital was receiving no money from the Exchequer. In later years, it began to receive substantial grants from the government, although it was still supported primarily by private subscription and fees from certain patients. Now, of course, the great bulk of its revenue comes from the national treasury. It still receives substantial '' free funds '' — donations and legacies — which are invested and are wholly free from control by the Minister of Health. The importance of free funds is that public money cannot be spent for purposes not included in the budget. The public grant covers the general expenses of maintaining the hospital — wages, food, fuel, and the like — but additional facilities and services which a modern hospital may reasonably provide are dependent upon free funds. For example, medical research, vital to public health, is privately supported. Without reciting in detail the objects for which free funds are disbursed, we are fully persuaded that they play an important role in the proper and efficient operation of the London Hospital.

There is in this case a continuity of function and activity. Notwithstanding the marked administrative and fiscal changes effected by the Act, the work of healing and caring for the sick at the London Hospital goes on as before, and viewing the problem simply as a question of the intention of the testatrix, we would not be justified in saying that the donee for whom she intended the gift has ceased to exist. That she was not concerned with technical details of administrative control is revealed by her general and inaccurate reference to '' the board of managers or directors'', instead of to '' the Governors of London Hospital.'' Her purpose was entirely charitable. The entire residuary paragraph indicates that. She desired her

money to cure the sick who came to that particular hospital for treatment, and in so doing to perpetuate the memory of her late husband. Both of those purposes will still be promoted by her legacy. Although the Act afforded British hospitals financial strength they had not previously enjoyed, testatrix could hardly have expected the London Hospital to remain static, and viewed as an institution for healing the sick, it' operates today in the same way as before the Act, in the same buildings, with the same staff and general organization, and on the original free and nonsectarian basis. As we said in an analogous situation, " The very real estate which it formerly owned is now being used as a hospital. What difference that if it has changed hands and is now operated by the city of Rome? " (*Matter of Harrington,* 243 App. Div. 235, 238.)

Appellants rely heavily upon subdivision (2) of section 60 of the Act: " Any sums paid as aforesaid to any such Board \* \* \* shall, so far as practicable, be applied by them for the purposes specified in the trust instrument." The gift presently in issue is " for such purposes as the board of managers or directors may deem advisable ", and there is no impracticability involved in obeying those vague instructions. The language, " so far as practicable ", was included in the Act, not with any thought of heedlessly disregarding trust provisions as appellants have suggested, but because it was anticipated that the radical administrative changes effected by the statute would often make literal compliance with the limitations of a gift either impossible or impracticable. The case of *Matter of White,* ([1951] 1 All E. R. 528, 530, 531, *supra*) affords an example. The gift was to " the Royal Infirmary, Sheffield, to be applied [by them] for the purposes of a home of rest for the nurses of that institution ". That particular institution became one of a group of hospitals designated as a teaching hospital. It was held that the nurses of the infirmary would have priority in the rest home. The court stated: " As to impracticability, it is for the next of kin to show that, and I think it is manifestly true to say that they have not shown it." " No doubt, the words ' so far as practicable ' would allow the board to put nurses from the other hospitals in the group into the home if there were room. I propose, therefore, to direct the trustee of the will to hand over the fund to the [board of governors] to be held by them, so far as practicable, on the trusts declared \* \* \* Only so far as it is not practicable to do so is the property usable for the general purposes of the group." There is nothing to support appellants' suggestion

that the legacy might be diverted from the hospital purposes envisioned by the testatrix. Subdivision (7) of section 7 of the Act, while not directly applicable here, is indicative: " Every Board of Governors * * * shall, in the case of any endowment transferred to them under this section * * * secure, so far as is reasonably practicable, that the objects of the endowment and the observance of any conditions attaching thereto, including in particular conditions intended to preserve the memory of any person or class of persons, are not prejudiced by the provisions of this section."

Appellants contend that the legacy never vested in the governors of the London Hospital, and they invoke the " divide and pay over " rule, which is of course subject to numerous exceptions. This court has stated (*Matter of Staats,* 272 App. Div. 139, 141, affd. 297 N. Y. 648) that the rule " is usually applied where the remainder is to be paid to a class, the membership of which cannot be determined until the happening of a future event. Here, the remainderman is named, which is a feature operating against the application of the rule." (See, also, *Matter of Gardner,* 140 N. Y. 122, 129; *Matter of Montgomery,* 258 App. Div. 64, 65; *Matter of Soy,* 143 Misc. 217, 221; *Matter of Wylde,* 129 N. Y. S. 2d 712, 716; *Matter of Chaim,* 168 Misc. 923, 929; *Matter of Herts,* 165 Misc. 738, 742.) We believe that distribution among the five-named charities was postponed solely for the convenience of the estate, in order to let in the life estate of James Vincent, and that the governors of the London Hospital took a vested interest at the death of the testatrix in 1931 (*Matter of Embree,* 9 App. Div. 602, 605, affd. on opinion below, 154 N. Y. 778; *Matter of Hallock,* 283 App. Div. 1091, appeal dismissed 308 N. Y. 299). By virtue of section 60 (1) of the Act, the interest was transferred to and vested in the new board of governors.

This conclusion accords with the decisions of the English courts, which have experienced no difficulty in holding that hospitals have continued to serve charitable ends after the appointed day (*Matter of Hunter,* [1951] 1 All E. R. 58; *Matter of Frere,* [1950] 2 All E. R. 513; *Matter of White,* [1951] 1 All E. R. 528, *supra; Matter of Morgan,* [1950] 1 All E. R. 1097; *Matter of Ginger,* [1951] Ch. 458; *Matter of Perreyman,* [1953] 1 All E. R. 223). In the *Hunter* case (*supra*) it was said: " The passing of the National Health Service Act, 1946, undoubtedly made a great and radical change from some points of view in the position of hospitals in general and this infirmary and dispensary in particular, but, although from many points of view the change was fundamental, from the point of view of

an ordinary layman interested in the healing and care of the sick in the district in which he lived * * * and from the point of view of a man who was desirous of commemorating his deceased father in conjunction with a place where such munificent work was carried on, I do not think the difference is very great.''

This result is also supported by two decisions of the Appellate Division, First Department, which cannot be distinguished from the case at bar (*Matter of Bishop*, 1 A D 2d 612, affg. 206 Misc. 7; *Matter of Perkins*, 2 A D 2d 655, affg. 1 Misc 2d 589), and by the decision in an Illinois case (*First Nat. Bank of Chicago* v. *King Edward's Fund*, 1 Ill. App. 2d 338, 352) in which the court stated: '' In no substantial sense can it be said that the hospitals have ceased to exist. They continue to exist and function as hospitals as they always did. It is only the method of administration or management that has been altered or changed. [Testator] did not make the gifts to the board of managers of the hospitals or to any particular entity or administration, nor with any limitation that their use was conditioned upon any particular form of administration.''

The remaining question involves allowances. Counsel for all parties to this appeal, appellants and respondents alike, were granted allowances from the general estate, instead of from the share of the London Hospital alone, as counsel for the appellant charities contend should have been done. However, the appellant charities sought to benefit by a construction that the share of respondent had lapsed, contending vigorously for the entire residuary estate, and it seems inequitable to burden the share of the victorious party with the payment of fees for the losers' attorneys. He who stands to gain should also stand to lose. The Surrogate has exercised his discretion, which is founded on a good reason and seems to be in accord with the usual practice in construction proceedings, which in a sense are beneficial to the entire estate by clarifying the will. (Surrogate's Ct. Act, §§ 231-a, 278; *Matter of Upjohn*, 304 N. Y. 366; *Matter of Fowler*, 265 App. Div. 617; *Matter of James*, 264 App. Div. 885; *Matter of Chaves*, 143 Misc. 872; *Matter of Seyfried*, 176 Misc. 759; *Matter of Curley*, 161 Misc. 391.)

The decree so far as appealed from should be affirmed.

All concur, BASTOW, J., in result only. Present — McCURN, P. J., KIMBALL, WHEELER, WILLIAMS and BASTOW, JJ.

Decree insofar as appealed from affirmed, with costs to all parties filing briefs payable out of the general fund. [See *post*, p. 829.]